W. H. Dysard and Geneva Dysard v. Commissioner.
Dysard v. Commissioner
Docket No. 2881-65.
United States Tax Court
T.C. Memo 1968-21; 1968 Tax Ct. Memo LEXIS 277; 27 T.C.M. (CCH) 104; T.C.M. (RIA) 68021; January 31, 1968. Filed *277 Held: Bad debt deductions denied due to petitioner's failure to establish the amount of the alleged losses and the taxable year in which the alleged debts became worthless. W. H. Dysard, pro se, 1102 Second National Bank *278 Bldg., Ashland, Ky. Wayne I. Chertow, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: Respondent determined deficiencies in the joint income taxes of petitioners as follows: Year
Deficiency
1961
$5,290.02
1962
4,088.03
The sole question presented for our decision is whether losses of $45,897.51 [1] and $9,409.85 claimed by petitioners on their income tax returns for 1961 and 1962, respectively, resulting from advances made to Ashland Business Service, Inc., are deductible. Findings of Fact Some of the facts have been stipulated; they are herby adopted as part of our findings. Petitioners, W. H. Dysard and Geneva Dysard, are husband and wife, and their legal residence at the time the petition 105 was filed herein was Ashland, Kentucky. Their joint returns for the years involved were filed with the district director of internal revenue, Louisville, Kentucky. Geneva is a party herein only by reason of having filed joint returns with her husband, W. H. Dysard, and the latter *279 will hereinafter be referred to as petitioner. Petitioner is a lawyer engaged in private practice at Ashland. He commenced his practice there in 1932. Since that time he has served as lawyer for The Second National Bank of Ashland and at time of trial was a director of that bank. In the latter part of 1947, J. N. Johnson & Company, Inc., was incorporated in Kentucky, and began a tree service business which involved keeping electric and telephone lines free from tree branches, and keeping the utility companies' rights-of-way free from brush. This service required the corporation to furnish trucks, tools, men and supervision. The incorporators were J. N. Johnson, Louis Cox, and petitioner. J. N. Johnson and petitioner each received 50 shares of stock and Louis Cox received 30 shares. Petitioner advanced $10,000 to the corporation to pay salaries and other expenses of starting the business. This sum represented $5,000 for petitioner's 50 shares of stock and a like sum for Johnson's 50 shares. Johnson was to pay this amount back to petitioner "when and if he could." Whether or not he ever did so does not appear of record. Petitioner arranged for other parties to furnish needed trucks *280 and equipment for use in Johnson & Company's business in the following manner: Two men, named Circle and Petrou, who had no investment or interest in Johnson & Company, agreed to purchase the required trucks and equipment and resell them on a conditional sales contract to the company. The transaction was effected by having Circle and Petrou form another corporation, Motor Trucks, Inc. Petitioner owned no stock in this corporation. The reasons for this complicated arrangement are unclear. At a later date Johnson & Company experienced financial difficulties and it was necessary to sell the assets of the corporation at a public sale. The assets were purchased by a representative of Motor Trucks, Inc., on December 27, 1949, and on January 2, 1950, the name of Motor Trucks, Inc., was changed to Ashland Tree Experts, Inc. Circle and Petrou surrendered their stock in and notes of Motor Trucks in consideration of new notes from the corporation for $5,000. The new notes did not have a fixed maturity date and were subordinate to other debts and obligations to be incurred by the newly named corporation. Common stock in Ashland Tree Experts, Inc, was issued as follows: Petitioner received *281 102 shares for $5.10; E. H. Williams received 97 shares for $4.85; and R. W. Becker received one share for five cents. Par value preferred stock of $29,000 was issued to petitioner although petitioner did not transfer any funds to the corporation in exchange for the preferred stock. The various adjustments necessary to the books and records resulted in a deficit surplus of $39,010. Ashland Tree Experts, Inc., also agreed to pay out of profits certain debts incurred by J. N. Johnson & Company, Inc., in the total amount of $24,494.28. Ashland Truck Service Company was incorporated in Kentucky on June 29, 1953, by petitioner and two other men, with petitioner receiving 90 out of the 100 shares of common stock which was issued. The name of the foregoing corporation was amended to Ashland Truck & Equipment Company in 1957. The activities of this corporation were closely related to the activities of Ashland Tree Experts, Inc., and separate records were not kept. Associated Electrical Contractors, Inc., which later became Electrical & Mechanical Supply Company, was incorporated in Kentucky on August 21, 1955. Petitioner was one of the three incorporators of this corporation and he received *282 one of the three shares of common stock which were issued. Ashland Business Service, Inc., was incorporated in Kentucky on October 31, 1957. Ashland Business Service, Inc., performed business services and much of the clerical work for the various other corporations in which petitioner was interested. Prior to its incorporation, Ashland Business Service, Inc., was owned and operated by E. S. Surmont, who was also secretary of Ashland Tree Experts, Inc., and Ashland Truck & Equipment Company. E. S. Surmont had become indebted to the petitioner in the amount of $6,096.94 because of money borrowed for use in the operation of the service business. Upon incorporation, the amount owed the petitioner was shown as an account payable to him. Petitioner was then issued 100 percent of the stock in Ashland Business Service, Inc., and $6,000 of the account 106 payable to petitioner was transferred on the books to common stock and $96.94 was transferred to paid-in surplus. After the incorporation, E. S. Surmont continued "to run" the business, but petitioner had a desk in the office and was president of the corporation. Associated Tree Experts, Inc., was incorporated in Kentucky in October *283 of 1957. There was issued to Ashland Business Service, Inc., 51 percent of the capital stock for $5.00, and to A. J. Blankenship 49 percent of the capital stock for $5.00. On January 1, 1958, petitioner transferred his 51 percent of the total common stock and his 100 percent of the preferred stock of Ashland Tree Experts, Inc., to Ashland Business Service, Inc. Also on January 1, 1958, 100 percent of the stock of Associated Electrical Contractors, Inc., was transferred to Ashland Business Service, Inc. The common stock of Ashland Truck & Equipment Company was also transferred to Ashland Business Service, Inc., in January. At this time petitioner owned 100 percent of Business Service's outstanding and issued stock. The foregoing corporations were primarily engaged in providing various services and they obviously had very little capital. While petitioner was in most cases an organizer of, resident agent for and president of each corporation, persons other than petitioner actually ran the business operations. Petitioner however was well acquainted with the corporate operations and spent considerable time directing their affairs. Due to the shortage of working capital, it was necessary *284 to borrow money from banks on a regular weekly basis with the corporations pledging their accounts receivable. Most of the notes to the banks were signed by petitioner as president of the various corporations and endorsed by petitioner as an individual. [2] The loans would not have been made to the various corporations without petitioner's personal endorsement of the notes. Petitioner's understanding with the banks was that he would only endorse notes which involved accounts receivable, which he personally knew were earned and collectible. However, he did not always abide by or live up to that understanding, and various of the accounts truned out to be uncollectible. Ashland Business Service, Inc., served as a clearing agent in the borrowing transactions, collecting the accounts receivable and paying off the notes. At various times there were not sufficient payments on the accounts receivable to pay the notes which *285 were due. Petitioner would then transfer personal funds to Ashland Business Service, Inc., in order that the corporate notes could be paid off when due. Apparently this practice began in 1958 and petitioner continued to transfer funds into Ashland Business Service, Inc., during the years thereafter including 1961, 1962 and 1963. Petitioner received repayments of a portion of the amounts advanced from time to time and during 1961 and 1962, but the net balance advanced as of December 31, 1961, was $53,397.51 plus additional net advances of $8,409.85 in 1962. How much was to meet the notes of any particular corporation at any particular time is not disclosed by the record, nor does the record reflect that all advances made by petitioner to Ashland Business Service were used for payment of corporate notes. Neither Ashland Business Service, Inc., nor any of the other corporations issued notes or other evidence of indebtedness to petitioner for the net amounts advanced and petitioner received no interest on the advances. How these items were reflected on the corporate books and records, if at all, is not disclosed in the record. Ashland Business Service, Inc., was only a business and clearing *286 agent for the corporations, handling their clerical work and loans and accounts receivable. The corporations whose notes were paid with petitioner's advances were the principal entities responsible to him for repayment. Again the evidence fails to disclose the amount of each corporation's liability to petitioner at any given time. In December of 1961 taxpayer voluntarily transferred all of his stock interest in Ashland Business Service, Inc., back to E. S. Surmont for no consideration; at that time that corporation agreed that it owed petitioner "$53,397.51 for money used for business purposes as directed" by petitioner and he in turn agreed not to enforce his claim against Ashland Business Service, Inc. However, petitioner continued to act as an officer of Ashland Business Service, Inc., in 1962 and years thereafter. Petitioner also 107 continued to transfer funds through Ashland Business Service, Inc., during 1963 and he continued to endorse notes of the various corporations during and after 1962 and 1963. Electrical & Mechanical Supply Company and Ashland Truck & Equipment Company were active in business during 1963. Petitioner did not incur losses from transactions concerning *287 Ashland Tree Experts, Inc. The bank or banks which made the loans did not know whether or not any of the notes of the corporations involved were worthless and any payments made by petitioner to cover any of the notes were made voluntarily by him. Endorsing the notes was not of benefit to petitioner's law practice and petitioner's law partners were opposed to his business activities which occupied part of his time and resulted in the endorsement of corporate obligations. Petitioner did not receive any legal, advisory or financing fees from any of the corporations connected with his alleged losses. He did receive a salary as an officer of Ashland Tree Experts, Inc., which varied in amount year to year from 1953 through 1958, as follows: 1953
$12,193.00
1954
14,288.00
1955
6,600.00
1956
12,800.00
1957
4,800.00
1958
1,938.30
He received no salary from any of the involved corporations in 1961 or 1962. In his income tax returns for 1961 and 1962 petitioner reported income from dividends, rents, his law firm (partnership) and legal fees and director's fees. He reported a small salary in 1961 from an unrelated company but no business income from any other sources, *288 businesses or activities and no income whatever from any of the corporations hereinabove mentioned. Petitioner was not in the trade or business of organizing, financing or operating corporations or of endorsing corporate notes nor were such endorsements connected with his profession; he did not collect fees from or invest in these various corporations with the idea of a quick and rapid turnover. His initial investments and his subsequent payment of corporate debts were made by him as an investor, not as an operator of any business or profession in which he was engaged in 1961 or 1962. In his 1961 and 1962 income tax returns petitioner deducted $45,897.51 and $9,409.85, respectively, and characterized these amounts as a "business loss deduction." Respondent determined that these deductions were not allowable under sections 165, 166 or any other section of the Internal Revenue Code. Petitioner is contesting this determination and further alleges, in an amended petition as hereinabove indicated that he incurred similar business losses in the additional amount of $6,500 in the year 1961. Opinion Petitioner claimed business loss deductions for 1961 and 1962 in the net amounts advanced *289 to Ashland Business Service, Inc., during those years for the purpose of paying off notes representing bank loans to other corporations which petitioner had endorsed. Although he claimed $45,897.51 on his return for 1961 and $9,409.85 on his return for 1962, at trial and on brief he contends that the amounts should be $53,397.51 for 1961 and $8,409.85 for 1962. At trial it was not clear whether petitioner was advocating loss treatment under section 165 [3] or bad debt treatment under section 166. However, on brief he contends that the deductions are allowable as business bad debts. He puts the issue this way: "Petitioner endorsed the notes and incurred the losses in trade or business activities and is entitled to deduct the losses in full as business bad debts." He also appears to argue alternatively that he is entitled to nonbusiness bad debt deductions. In his reply brief he states: "There was a debt and the only issue is whether it was a 'business bad debt' or a nonbusiness bad debt." Here the alleged losses resulted from the endorsement by petitioner of corporate notes. , *290 established that the sections of the Internal Revenue Code dealing with losses and bad debts are mutually exclusive and that a guarantor is required to claim the deduction as a bad debt loss, deductible as such or not at all, under section 166. [4] The Court utilized section 166(f) to 108 support the proposition that the deductibility of losses of a guarantor of corporate notes is governed by section 166; since 166(f) makes no distinction between guarantors and endorsers we believe that the Putnam rationale would apply equally to endorsers of corporate notes who by their endorsements are guarantors thereof. *291 It is basic to a section 166 deduction that the taxpayer shows that he was owed a debt in a specific amount which became worthless in the taxable year. Both parties in this case deal extensively in their briefs with the question of whether a debt was created, and, if so, whether it was a business or nonbusiness debt. It is argued by respondent that petitioner's endorsements were essential to obtaining capital for the thinly capitalized corporations and that the net advances should be characterized as capital investments. See ; . It is further contended by respondent that even if a bad debt loss occurred, petitioner should only be allowed a deduction for a nonbusiness bad debt since the losses were not attributable to the worthlessness of debts incurred in the taxpayer's trade or business which was his legal practice. See . A nonbusiness bad debt is treated as a loss from the sale or exchange of a capital asset held for not more than six months under section 166(d) (1) (B). The questions of whether *292 a valid debt was owed petitioner and, assuming it was, whether it was a business or nonbusiness debt, require extremely complex analysis for their resolution. While we are inclined to agree that the record here supports respondent's arguments and conclude that at very most petitioner may have suffered some losses that might be deductible as nonbusiness bad debts, we find it unnecessary to deal with these difficult problems or decide these issues here. Petitioner has utterly failed to establish the amounts of his alleged losses or the years in which they occurred. The case may thus be disposed of on the basis of these preliminary requirements for a bad debt deduction of any kind under section 166, Petitioner deducted amounts equal to his net advances to Ashland Business Service, Inc., during 1961 and 1962. However, petitioner is not claiming losses on loans to Ashland Business Service, Inc., but contends that this service company served only as a "Trustee" or conduit for payment of notes held by banks issued in connection with bank loans to the other corporations in which petitioner was interested. As far as the lending banks knew, the accounts receivable were being collected and *293 notes were paid off accordingly. Petitioner did not introduce into evidence any notes which were shown to have been paid off with his personal funds made available through advances to Ashland Business Service, Inc., and which allegedly give rise to the deductions here sought. Only one note made in 1961 was produced and that was apparently paid off by collection of the accounts receivable listed on the reverse side thereof and not by petitioner as endorser. A corporate ledger card showing lump-sum credits and debits relating to petitioner's financial dealings with Ashland Business Service, Inc., was the only documentary evidence of the alleged loan transactions and it is totally inadequate to establish the amount of losses allegedly attributable to petitioner's endorsements of the corporate notes in question. The evidence fails absolutely to establish how much was owed to petitioner by any corporation at any particular time or whether or not all advances to Business Service were actually used to pay off corporate notes on which petitioner may have been liable as endorser. 109 Petitioner has also failed to justify claiming 1961 and 1962 as years in which the alleged debts became *294 worthless. For all that we know, various debts may have been worthless in earlier years or have become worthless after the years in issue. Petitioner has not shown that he had no recourse against the primary corporate obligors on the notes; he certainly has not established worthlessness in 1961 and 1962. He evidently made no attempt to collect from the corporations and although the corporations may have had financial difficulties, both Electrical & Mechanical Supply Company and Ashland Truck & Equipment Company continued to operate in 1963 and petitioner continued his practice of endorsing corporate notes to obtain loans utilizing corporate accounts receivable as collateral. Petitioner introduced corporate tax returns showing negative earned surpluses in some of the years, but this does not establish insolvency of the corporations for bad debt purposes, or that the debts in question were worthless in 1961 and 1962. They may well have been worthless then, or in earlier years or subsequently, if indeed at all. Petitioner attempts to establish the year of loss by making reference to the shift in ownership of Ashland Business Service, Inc., and the agreement made in 1961 that he would *295 not attempt to recover the net advances from that corporation. That agreement was apparently voluntary and without any consideration whatever and so is of doubtful enforceability. Moreover, Ashland Business Service, Inc., never was solely liable for reimbursing the net advances since the funds were essentially paid to the banks on petitioner's behalf due to his underlying obligation as endorser of the various corporate notes. We thus fail to see how this factor establishes that the various debts became worthless in 1961 and 1962. Petitioner's own books and records, if there were any, were not produced at trial nor were the books and records of the various corporations presented. Fragments of some few of the corporate records were produced by petitioner but his testimony about the source of these records, the authenticity thereof and their correctness and reliability was almost totally self-defeating. Bank records to substantiate loans to the respective companies were likewise not offered at trial. Petitioner's testimony, which was almost the only evidence produced falls far short of carrying the day for him. It was conflicting and confused, very general in nature, and largely theoretical. *296 Petitioner was a vague and unconvincing witness, and his failure to present other witnesses to buttress his case was never satisfactorily explained, it being merely asserted in a sweeping manner that they were scattered everywhere and not available. We must conclude that the record before us is totally insufficient to establish petitioner's right to the deductions claimed and that petitioner has failed to carry his burden of proof to overcome the presumption of correctness of respondnnt's determination. Certainly as to his business bad debt loss claim, petitioner has failed to demonstrate that he was engaged in any trade or business in 1961 or 1962 to which the alleged losses related. At very most we might conclude, which in fact we cannot, that petitioner has established his entitlement to a nonbusiness bad debt deduction, but even as to that he had not established the amount or the year. We hold, therefore, that petitioner is not entitled to deduct any portion of the amounts in controversy and respondent's determination must be upheld. Decision will be entered for the respondent. Footnotes
1. At trial petitioners, without objection from respondent, amended their petition to claim an additional loss for 1961 of $6,500.↩
2. As mentioned earlier, petitioner had been the lawyer for The Second National Bank of Ashland since 1932 and he was on the board of directors of that bank. There are indications in the record that most if not all of these loans were made by The Second National.↩
3. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
4. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts. - When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * * (d) Nonbusiness Debts. - (1) General rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt: and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. * * * (f) Guarantor of Certain Noncorporate Obligations. - A payment by the taxpayer (other than a corporation) in discharge of part or all of his obligation as a guarantor, endorser, or indemnitor of a noncorporate obligation the proceeds of which were used in the trade or business of the borrower shall be treated as a debt becoming worthless within such taxable year for purposes of this section (except that subsection (d) shall not apply), but only if the obligation of the borrower to the person to whom such payment was made was worthless (without regard to such guaranty, endorsement, or indemnity) at the time of such payment.↩